647 So.2d 511 (1994)
STATE of Louisiana, Plaintiff-Appellee,
v.
Troy Pitre GUIDRY, Defendant-Appellant.
No. CR94-607.
Court of Appeal of Louisiana, Third Circuit.
December 7, 1994.
*513 John Phillip Haney, St. Martinville, for State.
William Robert Collins, New Iberia, for Troy P. Guidry.
Before KNOLL and WOODARD, JJ., and BERTRAND[*], J. Pro Tem.
*514 KNOLL, Judge.
Troy Pitre Guidry was charged by bill of information with attempted first-degree murder, a violation of LSA-R.S. 14:27 and 14:30(A)(2), with possession of more than 28 grams but less than 200 grams of cocaine, a violation of LSA-R.S. 40:967(F)(1)(a), and with intimidation of a witness, a violation of LSA-R.S. 14:129.1(b). The charge of intimidation of a witness was dismissed by the State prior to trial. A jury found the defendant guilty of attempted first-degree murder and possession of more than 28 grams of cocaine. Guidry was sentenced to fifteen years at hard labor on the attempted murder charge and twenty years at hard labor plus a $50,000 fine on the cocaine charge. The trial judge ordered the sentences to run consecutively. Setting forth twelve assignments of error,[1] Guidry appeals. We affirm.

FACTS
On June 11, 1992, law enforcement agencies in New Iberia, in cooperation with the St. Mary Parish Sheriff's Department, planned an undercover operation to purchase illegal narcotics from dealers in New Iberia. Based on information received by the New Iberia Police Department, the undercover operation specifically targeted Troy Pitre Guidry. Agent Arthur Welsh of the St. Mary Parish Sheriff's Department was assigned to work with a confidential informant to purchase cocaine from Guidry.
At approximately 4:00 p.m. on the afternoon of June 11, Agent Welsh and the informant, Harrison Welcome, drove to the area where police believed Guidry was located. Agent Welsh sent Welcome to tell Guidry that they were looking for crack cocaine. After a few minutes, Welcome returned and said that Guidry and his associate, David Jefferson, were checking the area "to see if some cops were around." As Guidry and Jefferson approached Agent Welsh, who was standing on the sidewalk, Guidry suggested that Agent Welsh might be a "narc." Jefferson agreed, and upon expressing concern that Agent Welsh was "wired," Guidry suggested that Agent Welsh be searched. Jefferson saw that Agent Welsh was wearing a beeper (actually a wireless transmitting device or "body mike") and attempted to grab for the device. A fight ensued. As Jefferson struggled with Agent Welsh, Guidry crushed a beer can over the officer's head, causing him to fall to the ground. Guidry then repeatedly kicked Agent Welsh in the head, while screaming to Jefferson, "Kill the bitch."
The members of the undercover team who were assigned to monitor the body mike worn by Agent Welsh arrived on the scene within minutes. Guidry and Jefferson fled on foot. Agent Welsh was found lying in a ditch, unconscious and bleeding from the nose and mouth. He was taken to a local hospital, where he underwent surgery to repair a broken jaw. Guidry and Jefferson were arrested a short time later.
Thereafter, based on information acquired from Jefferson during questioning and corroborated by other sources, officers discovered that Guidry stored large amounts of drugs at his sister's apartment in New Iberia. A search warrant was sought and obtained for the residence of Guidry's sister, Veronica Gardner. In a back bedroom of the apartment, officers located a total of 74 grams of cocaine. A fingerprint found on a medicine bottle containing two rocks of crack cocaine matched the print of Troy Guidry's right index finger.

DEFENDANT'S PRO SE MOTIONS
In his first assignment of error, the defendant claims that the trial court erred in not ruling on his pro se motions prior to sentencing. Defendant's retained attorney allegedly refused to file the motions because he had not been paid.
On November 4, 1993, while still represented by counsel, the defendant attempted to file pro se motions for a new trial and for a post verdict judgment of acquittal. The motions were returned to defendant by the Iberia Parish Clerk of Court along with the trial *515 judge's handwritten note stating, "Will not consider. Defendant is represented by counsel."
The trial court is not required to consider the merits of a defendant's pro se motions if the defendant is represented by counsel. State v. Greer, 572 So.2d 1166 (La. App. 1st Cir.1990). A defendant has no right to be both represented and representative. State v. Bodley, 394 So.2d 584 (La.1981), and cases cited therein. We find this assignment of error to be without merit.[2]

PROBABLE CAUSE TO OBTAIN A SEARCH WARRANT
In the defendant's second assignment of error, he argues that the trial court erred in denying his motion to suppress physical evidence seized pursuant to an allegedly invalid search warrant. Defendant contends that the affidavit in support of the warrant failed to demonstrate that probable cause existed to search Veronica Gardner's apartment.
The affidavit at issue states in relevant part:
"The probable cause is based on the following:
Affiant was informed by officers of the New Iberia Police dept that on June 6, 1992 the New Iberia police made a traffic stop of Troy Pitre Guidry and found Guidry to be in possession of a large sum of money. Once officers found the money Guidry fled the scene with the money and in the process struck the officer who initiated the traffic stop. On two other occasions Guidry has been charged with possession of cocaine with the intent to distribute[;] the status of these charges are [sic] not known at this time. On this date affiant together with other narcotics officers with the New Iberia police dept. were [sic] conducting an operation in which an undercover officer was attacked by Guidry and the agent was hospitalized as a result of the beating. One of the other parties involved in the beating of the agent (David Jefferson) admitted that he did sell cocaine for Guidry. At approximately 10:00 am on June 11, 1992 he, Jefferson observed several large cookies of cocaine in his possession (guidry) at the above mentioned address which is the address of Troy Guidry's sister Veronica Gardner. Jefferson stated that Guidry kept three of the cookies and placed the other cookies which he had back into the bedroom of the residence and then they departed. Affiant was also informed by Lt. Hills and Det. Mcdaniels that Guidry admitted to being in possession of cocaine and money on June 6, 1992 at the time he was stopped for a traffic violation. Affiant has been told by other reliable informants which affiant has used in the past that Guidry over the last several months has been selling crack cocaine in the New Iberia area. Affiant was also told by a reliable informant that Guidry was in possession of crack cocaine this date which substantiatied [sic] the information."
Although other informants stated that the defendant sold or possessed drugs, defendant contends that no one other than David Jefferson, a co-participant in the beating of Agent Welsh, placed the drugs allegedly possessed by Guidry at Veronica Gardner's apartment. Therefore, defendant concludes, probable cause to search the apartment was lacking because Jefferson was "trying to extricate himself by saying anything that he can to avoid prosecution for [the attempted murder] charge." We disagree.
We find that the affidavit plainly recites facts which would establish to the satisfaction of a neutral and detached magistrate probable cause to search Ms. Gardner's apartment. In addition to the statements of various police officers and confidential informants regarding Guidry's criminal activities and Jefferson's first hand observation of the cocaine in the apartment, the affidavit also recounted personal and recent participation by Jefferson in the possession and distribution of cocaine, proscribed by the provisions of LSA-R.S. 40:967.
"Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People do not lightly admit a *516 crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibilitysufficient at least to support a finding of probable cause to search."
United States v. Harris, 403 U.S. 573, 583, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971).
Mindful that a magistrate's determination of probable cause is to be paid great deference by the reviewing court, State v. Landry, 557 So.2d 331 (La.App. 3d Cir.), writ denied, 561 So.2d 114 (La.1990), we conclude that the affidavit, considered as a whole, was sufficient to support issuance of the search warrant. This assignment of error is without merit.

"OTHER CRIMES" EVIDENCE
The defendant's third and fourth assignments of error concern the testimony of Sheila Anderson, who was called by the State to testify that she attempted to purchase cocaine from the defendant on June 11, the date of the present offenses, and testimony regarding the defendant's arrest in New Iberia on June 5, 1992, one week before the incident involving Agent Welsh. We will discuss these two assignments together since both are related.
The trial court ruled that Sheila Anderson would be allowed to testify that she tried to purchase crack cocaine from the defendant on the day that Agent Welsh was beaten. She testified that when she approached Guidry about the purchase, Guidry told her to meet him around the corner in fifteen minutes. When she arrived, Guidry said to come back later "because the lady across the street [is] watching." Ms. Anderson stated that she never went back because of the Agent Welsh incident.
The trial court also ruled that Lieutenant David Mestayer of the New Iberia City Police could testify as to events which occurred on June 5, 1992. At about 8:30 p.m., Lieutenant Mestayer observed a car driven by the defendant leave the grounds of New Iberia Senior High School. The car had an expired license plate, so Lieutenant Mestayer pulled the vehicle over to investigate. When asked for his driver's license, Guidry told the officer that it was in the trunk in a paper bag. The two went to the rear of the car, and when Guidry pulled out the paper bag, he hesitated. Lieutenant Mestayer, fearing for his safety, reached for the bag and opened it. Inside was a large amount of currency. Guidry grabbed the bag and fled on foot. He was later arrested; however, the paper bag was never retrieved. After he was in custody, Guidry told police that the bag contained several thousand dollars and a small quantity of drugs, and since he "couldn't get caught with it," he ran from Lieutenant Mestayer. At the Prieur hearing, the trial judge stated that "it's circumstantial evidence with regard to the money and the large amount of cocaine that we have as the subject matter of this charge. It's not evidence of other crimes; it's for the jury to draw whatever conclusion they want to make from that evidence."
The defendant contends that the testimony of both Sheila Anderson and Lieutenant Mestayer should have been excluded on grounds of relevancy. The State argues, however, that the testimony was relevant to the issue of the defendant's possession of cocaine on June 11. The trial judge noted that since this is a constructive possession case, the evidence was admissible to show possession as well as mode of operation pursuant to Article 404(B) of the Code of Evidence.
We find that this testimony was irrelevant and was improperly admitted. However, even had the evidence been excluded, sufficient evidence remains from which the jury could conclude beyond a reasonable doubt that the cocaine in Veronica Gardner's apartment belonged to the defendant. State v. Mondy, 532 So.2d 863 (La.App. 4th Cir.1988), writ denied, 540 So.2d 338 (La.1989).
This assignment of error is meritless.

UNTIMELY PRIEUR NOTICE
In the defendant's fifth assignment of error, he contends that he received insufficient notice of the State's intention to call Sheila Anderson as a witness and to introduce at trial evidence of the June 5, 1992 arrest. We do not agree.
*517 The State filed its notice on Wednesday, September 29, 1993. A hearing to determine the admissibility of the evidence was set for the following Friday, October 8. On Tuesday, October 12, the trial began; Lieutenant Mestayer was called as the State's first witness. Sheila Anderson's testimony was taken the following day, October 13.
The purpose of the discovery rules of the Code of Criminal Procedure is to eliminate the unwarranted prejudice which could arise from surprise testimony. State v. Toomer, 395 So.2d 1320 (La.1981). However, the failure of the state to comply with discovery does not warrant automatic reversal; rather, the defendant must show that the failure was prejudicial, and as such, constitutes reversible error. State v. Ray, 423 So.2d 1116 (La.1982).
In the case sub judice, even assuming that the notice was "late," the defendant has failed to demonstrate how he was prejudiced thereby. Guidry had approximately a week and a half before the Prieur hearing and two weeks before trial to prepare his response to the State's motion, and he has made no allegation that he was unable to produce evidence or witnesses as a result of the untimely notice. Moreover, after deciding to go forward with the Prieur hearing, the trial judge told defense counsel that "if, at the conclusion, you feel prejudiced some kind of way, Mr. Wooderson, I'll entertain whatever motion you want to make." Defendant did not avail himself of this opportunity, nor did he request a continuance of the trial date. Accordingly, we find no reversible error in the State's failure to give earlier notice of its intention to call Sheila Anderson as a witness and to introduce at trial evidence of the June 5, 1992 arrest.

SUFFICIENCY OF THE EVIDENCE
When the issue of sufficiency of the evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino v. King, 436 So.2d 559 (La. 1983) (citing State v. Richardson, 425 So.2d 1228 (La.1983)).

Count I: Attempted First-Degree Murder
LSA-R.S. 14:30(A)(2) defines first-degree murder as "the killing of a human being [w]hen the offender has a specific intent to kill or to inflict great bodily harm upon a ... peace officer engaged in the performance of his lawful duties." A conviction for attempted murder requires a showing that the defendant had specific intent to kill and committed an act tending to accomplish that purpose. State v. Butler, 322 So.2d 189 (La.1975).
The defendant suggests in brief that he did not know that Agent Welsh was a police officer. We find this contention unbelievable. At trial, David Jefferson testified at length as to the events surrounding the beating of Agent Welsh:
"Q: All right. So what happened once y'all got back to the corner and y'all talked about the fact that there were some narcs and Harrison had brought a narc with him?
A: We was walking down there. And I saidwe sat, talking, and I said, "He must be wired or something, you know." And he told mehe said to check him, you know.
Q: Whenwhen you say "he", who are you talking about?
A: Troy. To see if he had a wire, you know. I told him, "Yeah, I'm gonna' check him." I kept saying, "I'm gonna' check him, you know." So when I got down there toward the car, you know, I asked him if heno, Troy asked him if he had something.
Q: Okay. Now, let's back up. So there's no doubt in your mind that you and Troy knew that the person that was in the car, *518 Mr. Welshyou later learned his name was a narcotics agent, a police officer?

A: Yes, sir.
Q: Just so the jury will know, y'all were down on the corner all this time all this was going on, talking about the police being in the area?
A: Yes, sir."
In a statement given to police after he was arrested, Guidry himself admitted that he knew Agent Welsh was an undercover officer:
"I said, `David, that dude a cop, yeah.' So David said, `You want me to search him?' So David did like this and he had a beeper on his side.... And then, after all the narcotics, them two pulled up first, and then after that we took off. I said [to David], `I told you that dude was a cop.'"
We find that the State met its burden of proving that Guidry knew that the victim was a police officer.
Defendant also points out that "threatening to kill someone in an altercation is not specific intent to prove that you intended to carry out that threat." While we might ordinarily agree, we find that Jefferson's testimony belies Guidry's contention that he did not intend to kill Agent Welsh:
"Q: Okay. Did you see whatwhere Troy was as you were striking Mr. Welsh?
A: He was on this side of me. When I was on top of him, he was stomping him in the head. (Witness indicates.)
Q: Well, where were you when Mr. Guidry was stomping him on the head?
A: I was on the ground over him.
Q: And what part of Mr. Guidry's foot was he using to stomp on Mr. GuidryMr. Welsh's head?
A: About the bottom part of his foot.
Q: And how highif you could, demonstrate to the jury how he washow he was striking him.
A: He was stomping him on his head like that. (Witness indicates.)
Q: All right.
A: Hard.

Q: And during that time, was Mr. Guidry saying anything or directing you to do anything to Mr. Welsh?
A: He was screaming, "Kill the bitch."

Q: Kill the what?
A: The bitch.
Q: Was there a point in time when Mr. Welsh was basically out of it, just laying there, notnot conscious?
A: Yes, sir.
* * * * * *
Q: Okay. And what did Mr. Guidry do afteras Agent Welsh laid on the ground?
A: He was still stomping him.
Q: And was Mr. Welsh unconscious at that time?
A: Yes, sir.
Q: Okay. And what part of the body was he stomping on?
A: On his head.
Q: How long did that continue, the stomping?
A: `Til the police pulled up."
After the incident, Agent Welsh was taken to the hospital and underwent surgery to repair his broken jaw. Agent Welsh testified at trial that he continues to have problems with memory loss and seizures, which his physicians attribute to the severe beating he received.
In addition to Jefferson's compelling testimony, the State introduced at trial pictures of the defendant, taken after his arrest, and of Agent Welsh, taken while he was in the hospital. Agent Welsh was a relatively small man. He was described by another officer as approximately 5'4" tall, and weighing about 120 pounds. On the other hand, Guidry is obviously much larger and stronger, approximately 6'0" tall, and weighs considerably more than Agent Welsh. We have no difficulty believing that Guidry fully intended to kill Agent Welsh had he not been stopped by the timely arrival of the police.
Viewed in the light most favorable to the prosecution, it is clear that the jury could have reasonably found that Guidry had specific intent to kill a police officer in the line of duty and that he acted toward accomplishing this purpose.

*519 Count II: Possession of Cocaine
LSA-R.S. 40:967(C) prohibits the knowing or intentional possession of cocaine. An additional penalty is provided in Subsection (F) if the amount of cocaine possessed is more than 28 grams, but less than 200 grams. Possession of illegal drugs can be in the form of actual possession, if the contraband is found on the defendant's person, or constructive possession, if the circumstances show that the contraband is subject to the defendant's dominion and control. State v. Trahan, 425 So.2d 1222 (La.1983); State v. Williams, 608 So.2d 266 (La.App. 3d Cir. 1992).
Whether a defendant has dominion and control over illegal drugs involves an analysis of the
defendant's knowledge that illegal drugs are in the area; the defendant's relationship with the person found to be in actual possession; the defendant's access to the area where the drugs were found; the evidence of recent drug use by the defendant; the defendant's physical proximity to the drugs; and any evidence that the particular area was frequented by drug users.
State v. Tasker, 448 So.2d 1311, 1314 (La. App. 1st Cir.), writ denied, 450 So.2d 644 (La.1984) (citing Bujol v. Cain, 713 F.2d 112 (5th Cir.1983)). The determination of whether there is possession sufficient to convict depends upon the facts peculiar to each case. State v. Trahan, supra (citing State v. Cann, 319 So.2d 396 (La.1975)).
David Jefferson testified at trial that on many occasions, he went with Guidry to Veronica Gardner's apartment to retrieve cocaine. If Veronica was not at home, Guidry went to the apartment of another sister who lived in the same apartment complex and picked up a key. Jefferson stated that Guidry would go to the back of Veronica's apartment and come out with crack cocaine, which they would either sell or use themselves.
On the morning of June 11, 1992, Guidry and Jefferson went to Veronica's apartment. As he had done many times before, Guidry went into a back room and came out with cocaine, and the two men left. Guidry cut one ounce of the crack cocaine into pieces with a razor blade and put the pieces into a medicine bottle. When Veronica Gardner's apartment was searched later that evening, a medicine bottle containing crack cocaine was recovered from the bedroom; the defendant's fingerprint was found on the bottle.
Under the Jackson standard of review, we find that the evidence presented was sufficient to prove Guidry's constructive possession of the cocaine found in his sister's apartment.
This assignment of error lacks merit.

EXCESSIVENESS OF THE SENTENCES
The defendant next contends that the trial court erred in sentencing him, a first-time felony offender, to consecutive sentences of fifteen years for attempted first-degree murder and twenty years for possession of more than 28 grams of cocaine. We disagree.
Regarding the order of the trial judge that the sentences be served consecutively, Article 883 of the Louisiana Code of Criminal Procedure provides in pertinent part:
"If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently...."
At sentencing, the trial judge made the following comments:
"I feel, too, that the sentences should run consecutively, because they're two completely independent things. One could easily have happened without the other. And had they both really been the fruit of a common incident and naturally flowed from it, I would make them run concurrently. But I think they should run consecutive for that reason. One could have been committed without the commission of *520 the other very, very easily, unlike most charges that arise out of one incident."
The language of Article 883 clearly contemplates that if the defendant is convicted of two or more independent offenses, the sentences are to run consecutively. However, when the offenses are based on the same act or transaction or constitute parts of a common scheme or plan, the sentences will generally run concurrently. In the case sub judice, the trial court found that the defendant's crimes were independent of each other, and were not based on the same act or transaction nor parts of a common scheme or plan. We find no error in this determination. Defendant's sentences were properly ordered to run consecutively rather than concurrently.
Nor do we find that the sentences imposed are excessive. In State v. Smith, 93-0402 (La. 7/5/94), 639 So.2d 237, our Supreme Court held that when the trial judge adheres to the requirements of Article 894.1 of the Louisiana Code of Criminal Procedure and imposes a sentence within the statutory range, an appellate court is limited to a traditional review of the sentence for constitutional excessiveness.
The record of the present case indicates that in compliance with Article 894.1, the trial judge adequately stated the considerations taken into account and the factual basis for the sentences imposed. At sentencing, the trial judge stated that he had considered numerous letters and a petition submitted on behalf of the defendant, the defendant's extensive criminal record, and the appropriate sentences recommended by the sentencing guidelines. The judge further commented:
"Considering all the information available to me from my personal presence at the trial where the jury found you guilty and my review of everything I've been able to find out about you, I feel that that sentence is appropriate. I've given it a lot of thought, a lot of thought, because I'm aware of the heavy responsibility on me. And to the extent that it may deviate from the guidelines, I feel it's appropriate because of what I have said and, of course, because of my many years of experience in the criminal justice system in this area. I think a lesser sentence would deprecate the seriousness of these offenses; that you're in need of correctional treatment that would best be served by the sentences that I've imposed; and that there is indeed a need to try to deter others from what has become a cancer in our society, and that is drugs and the potential harm and risk that comes to those who try to solve these drug cases because there's no victims to report them. If there's a stabbing or a shooting, the victim will say who did it. You don't have that in a drug case. So you have to send out these undercover agents. It's very important to society that no harm at all ever comes to them, no matter what."
As both sentences were within the statutory range,[3] all that remains for this court to decide is whether the defendant's sentences are constitutionally excessive. The standard for appellate review is whether the sentence is "nothing more than the purposeless imposition of pain and suffering" or is "grossly out of proportion to the severity of the crime." State v. Davis, 449 So.2d 452, 453 (La.1984) (citations omitted). Under this standard, we decline to hold that the defendant's sentences of fifteen years on the attempted first-degree murder charge and twenty years on the possession of cocaine charge are constitutionally excessive.
This assignment of error is without merit.

INEFFECTIVE ASSISTANCE OF COUNSEL
In his eleventh assignment of error, the defendant cites several instances which he allege constitute ineffective assistance of counsel at trial and, ultimately, reversible *521 error. After setting forth the applicable law, we will discuss each allegation in turn.[4]
In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court confronted for the first time a defendant's claim of "actual ineffectiveness" of counsel's assistance in a case going to trial. The Court established a two-part test for judging a claim of ineffective assistance of counsel:
"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."[5]
466 U.S. at 687, 104 S.Ct. at 2064.
In discussing the second element, prejudice to the defendant, the Court was careful to note that it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Rather, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." 466 U.S. at 695, 104 S.Ct. at 2068-69. In making this determination, the reviewing court must consider the totality of the evidence before the jury. With these principles in mind, we turn to the defendant's specific allegations of ineffectiveness.

1. Marco, the Columbian drug dealer
At trial, the State called Thaddeus Robinson of the New Iberia Police Department as an expert witness in the field of narcotics interdiction. Agent Robinson testified that over the course of several months, Troy Guidry had wired thousands of dollars to a woman named Margorie Butler who lived in Houston, Texas:
"Q: Okay. And does Margorie Butler have connections to any persons in the Houston area that you were conducting an investigation on regarding narcotics transactions?
A: A Columbian, sir.
Q: And what was that person's name, sir?
A: Marco.
Q: Did there come a time, Agent Robinson, when you received or recovered a picture that was taken in Louisiana involving Margorie Butler and this person named Marco?
A: Yes, sir.
BY MR. HANEY:
I'd like this marked as State's Exhibit 49.
Q: I show you what's been marked as State's Exhibit 49 and ask if you recognize this photo, sir.
A: Yes, sir.
Q: Okay. What does that photograph depict, sir?
A: Troy Guidry, the Columbian drug dealer, Margorie Butler, and I think that's Jackie Dauterive.

*522 Q: Okay. And Jackie Dauterive is what relationship to Mr. Guidry?
A: Is aa girlfriend."
Counsel for the defendant, J. Michael Wooderson, made no objection to this line of testimony, nor to the introduction of the photograph. Later, the "Marco" line of questioning resumed:
"Q: Did you attempt to determine what Miss Butler's relationship was with Mr. Guidry?
A: Yes, sir, we did.
Q: Do you know whether or not Mrs. Butler and this person by the name of Marco visited the New IberiaSt. Martin Parish area?
A: Yes, sir. I believe that picture was taken during the St. Martinville Mardi Gras.
Q: All right. And it would be fair to say that there's aan ongoing investigation by the Houston Police Department involving Marco's cocaine trafficking activities in the Houston area?
A: Possibly the D.E.A."
At this point, Mr. Wooderson objected for lack of foundation. The trial court overruled the objection and allowed the witness to answer. On cross-examination, Mr. Wooderson asked Agent Robinson to explain his statements about Marco:
"Q: In other words, your testimony is that some fellow named Marco is implicated with Troy Guidry in doing something committing some kind of crime?
A: No, sir. A Columbian drug dealer by the name of Marco was associated with Troy Guidry and his drug dealings, sir."
Later in the trial, the State called Lieutenant Claude Hills, the narcotics supervisor for the New Iberia Police Department. Lieutenant Hills testified as to the relationship that his department has with law enforcement agencies in Texas:
"Q: Okay. And do youwhen you get information about what's going on in New Iberia, do you request Houston to assist you and try getting intelligence information on thison these particular people?
A: That's correct. If we can associate them with someone in Houston, we'll contact their analysis group.
Q: Were you able to associate anybody in the Houston area with Mr. Guidry as it relates to drugs?
A: That's correct.
Q: And who was that, sir?
A: There's a subject only known to us as Marco.
Q: And to your knowledge, has Marco been in the New Iberia area with Mr. Guidry on occasions?
A: Yes.
Q: And have you spoken with people who've seen Mr. Guidry in the presence of Marco on several occasions?
A: I spoke to several people who have seen Mr. Guidry with Marco on more than one occasion.
* * * * * *
Q: And did they identify Mr. Guidry as having a particular relationship with Marco?
A: I was informed that Marco was Mr. Guidry's supplier."
Again, Mr. Wooderson made no objection.
On appeal, defendant now contends that he was severely prejudiced by all of the "Marco" evidence, and in particular, by the introduction of the photograph taken of him with Marco and Margorie Butler. The State argues that the evidence was relevant to show that the defendant was in the business of selling narcotics and served to corroborate the fact that the cocaine found in Veronica Gardner's apartment belonged to the defendant.
Under the facts of this case, we do not see sufficient prejudice in the line of questioning regarding Marco, or in the introduction of the photograph, to justify a reversal. Even had this testimony and the photograph been excluded at trial, the State's remaining evidence overwhelmingly establishes the defendant's guilt beyond a reasonable doubt. Stated in another way, the defendant has failed to demonstrate a reasonable probability that, absent the alleged errors, the jury would have reached a different result.

*523 2. Judge's comment on the evidence
Defendant also claims that his trial counsel was ineffective because counsel failed to object to a comment on the evidence made by the trial judge.
While the defendant was in police custody on the night of June 12, 1992, part of his statement to Detectives Thaddeus Robinson and Leslie McDaniels was taped. Because portions of the tape were inaudible or difficult to understand, the tape was transcribed by a court reporter. When the State sought to introduce both the tape and the transcript into evidence at trial, counsel for the defendant had no objection to the tape itself, but objected to the transcript on the grounds that the tape was the best evidence of what Guidry told police. The trial judge declined to rule immediately, and told the jury that "we'll come back to that issue later." The following morning, Judge Bienvenu made the following statement:
"Okay, ladies and gentlemen, you will recall yesterday when the State offered thisthis tape into evidence, as well as a transcription or a typewritten copy of what's supposed to be on the tape, the defense had no objection to the tape itself but had an objection to the transcription. What Mr. Haney had in mind was to play the tape and give each of you a copy of the transcription and let you follow along. The basis for the objection is that the tape is the best evidence of its contents, not what somebody else typed out by listening to it.
Well, I feel that the law is that, while it is true that the tape is the best evidence, that it is permissible, if it would help you, to allow you toto read along with ato follow along with a transcription while the tape is played. I listened to it, and I read the transcription. The tape is difficult, and there's a lot of inaudible portions of it. Of course, the court reporter who transcribed it, apparently ... took great pains to try to listen carefully and maybe play back and that sort of thing, it would seem to me. But she has a lot of portions where she just has `inaudible', you know. So weif you can understand what the tape says, then you can supply those things, but she couldn't, you know.
Andand II think, for me, and II hesitate toto comment on the evidence, but I think I need to tell you this. Before I made the decision, I felt it was important that I listen to the tape and read along, as you would be doing. I don't find anywhere any attempt to falsify anything. There may be some omissions where the tape is saying something and the court reporter maybe is not typing it out. There may be some things that you will disagree with her interpretation; in other words, where a word or two may be different. But I think, generally speaking, the transcription will be of help to you. Itit's not a clear tape, and I think, without the transcription ... you could understand the evidence better by having the transcription. Sososo we'll go along with that.
Now, you understand that the tape is the best evidence. So, if you find any variances or differences between the tape and the transcription, you go with the tape. That's actually what was said, you understand? Everybody comfortable with that?
Okay. With that, we can move along."
While the exhibits were being passed to the jury, Mr. Wooderson noted for the record his objection to the court's ruling and to the introduction of the transcript. Judge Bienvenu responded:
"BY THE COURT:
All right. But, as I understand it, there's no objection toto my explanation to the jury.
BY MR. WOODERSON:
No, Your Honor.
BY THE COURT:
All right. Just to the transcript itself being offered.
BY MR. WOODERSON:
Yes, Your Honor."
The defendant argues in brief that the trial judge violated the provisions of Article 772 of the Code of Criminal Procedure by commenting on the evidence, which placed a "stamp of approval" on the authenticity of the transcript.
*524 A trial judge should refrain from making such improper comments in the presence of the jury. And it goes without saying that defense counsel should have immediately objected to the remarks. In the present case, however, the defendant was not so prejudiced by either the remarks or the failure to object as to require a reversal under Strickland. Therefore, we find the error harmless.

3. Failure to request responsive verdict
The defendant's third allegation of ineffective assistance of counsel concerns his attorney's failure to request that the jury be charged with second-degree battery and attempted negligent homicide as responsive verdicts to the charge of attempted first-degree murder.
Article 814(A)(2) of the Code of Criminal Procedure sets forth the only responsive verdicts which may be rendered when the offense charged is attempted first-degree murder. They are: guilty, guilty of attempted second-degree murder, guilty of attempted manslaughter, guilty of aggravated battery, and not guilty. When responsive verdicts are mandated by Article 814, as in this case, the trial court is without authority to alter or add to the legislatively prescribed responsive verdicts. State v. Square, 433 So.2d 104 (La.1983) (citations omitted); State v. Major, 597 So.2d 108 (La.App. 4th Cir. 1992). Therefore, we find that counsel did not act unreasonably in refusing to comply with the defendant's request.

4. David Jefferson's testimony
The defendant next contends that counsel was ineffective for failing to object when the prosecutor asked David Jefferson on direct examination whether he and Guidry knew that Agent Welsh was a police officer.
"Q: Okay. Now, let's back up. So there's no doubt in your mind that you and Troy knew that the person that was in the car, Mr. Welshyou later learned his namewas a narcotics agent, a police officer?
A: Yes, sir."
Defendant states in brief that since Jefferson is not an expert in the field of psychiatry or psychology, the State should not have asked Jefferson to reach a conclusion as to the defendant's state of mind. However, the purpose of the State's question was not to elicit an expert opinion from David Jefferson. It is clear from the context of this testimony that both Guidry and Jefferson knew that Agent Welsh was an undercover police officer; the State was simply trying to clarify this fact for the benefit of the jury. We also note that Jefferson's testimony was not the only evidence presented which proved that Guidry knew that Agent Welsh was a police officer. After he was arrested, Guidry himself admitted that when he first saw Agent Welsh, he told Jefferson, "David, that dude a cop, yeah." For these reasons, defendant suffered no prejudice by the failure of counsel to object to Jefferson's testimony.

5. Aggregate value of all errors
Finally, defendant asserts a "catch all" claim of ineffectiveness, suggesting that although each claim listed under this assignment of error may not sufficiently prove ineffectiveness of counsel, the aggregate value of all alleged errors committed by defense counsel constitutes reversible error.
Upon careful review of the entire record, we do not find that defendant has established his claim of ineffective assistance of trial counsel. The errors of which defendant complains do not rise to the level of a reasonable probability that absent the errors, the jury would have a reasonable doubt respecting guilt. The evidence against the defendant was strong, and we find, very easily proved his guilt beyond a reasonable doubt.
This assignment of error is without merit.

ERRORS PATENT
Pursuant to LSA-C.Cr.P. Art. 920, we have reviewed the record for errors patent, and find none.

CONCLUSION
For the reasons assigned, defendant's conviction and sentences are affirmed.
AFFIRMED.
NOTES
[*] Judge Lucien C. Bertrand, Jr., Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] Assignments 6, 7, and 8 have been abandoned by the defendant in his brief and will not be considered, in accordance with Rule 2-12.4 of the Uniform Rules of the Courts of Appeal.
[2] The defendant will suffer no prejudice by our ruling on this assignment of error since all issues raised in the two pro se motions have been presented in his appeal.
[3] On the attempted first-degree murder charge, defendant could have received a sentence of up to fifty years at hard labor. LSA-R.S. 14:27(D)(1). On the charge of possession of more than 28 grams but less than 200 grams of cocaine, defendant could have received a sentence of five to thirty years at hard labor plus a fine of not less than $50,000, nor more than $150,000. LSA-R.S. 40:967(F)(1)(a).
[4] A claim of ineffective assistance of counsel is more properly raised in the trial court by an application for post-conviction relief. This enables the district judge to conduct a full evidentiary hearing. State v. Seiss, 428 So.2d 444 (La. 1983) (citations omitted). However, if the claim is raised on appeal by an assignment of error and the record contains evidence sufficient to decide the issue, we may consider the defendant's claim in the interest of judicial economy. Id. at 449.
[5] Writing for a majority of the Court in Strickland, Justice O'Connor noted that it is unnecessary for a reviewing court to address both components of the inquiry if the defendant makes an insufficient showing on one. "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697, 104 S.Ct. at 2069.