STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

07-388

STATE OF LOUISIANA

VERSUS

ROBERT WAYNE BROWN

\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 279,245
HONORABLE THOMAS M. YEAGER, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*

GLENN B. GREMILLION
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Glenn B. Gremillion, and J. David Painter, Judges.

**AFFIRMED IN PART, REVERSED IN PART,
AND RENDERED, AND REVERSED IN PART
AND REMANDED.**

**James C. Downs**
**District Attorney**
**9th Judicial District Court**
**701 Murray Street**
**Alexandria, LA 71301**
**(318) 473-6650**
**Counsel for Plaintiff/Appellee:**
    **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**Counsel for Defendant/Applicant:**
**Robert Wayne Brown**

**Robert Wayne Brown**
**ALC-Jupiter A2**
**3751 Lauderdale Woodyard Road**
**Kinder, La 70648**
**In Proper Person:**
**Robert Wayne Brown**

GREMILLION, Judge.

The defendant, Robert Wayne Brown, was convicted of attempted first degree murder, a violation of La.R.S. 14:27 & 30; terrorizing, a violation of La.R.S. 14:40.1; and possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1. The trial court sentenced him to ten years at hard labor for terrorizing, twenty years at hard labor for attempted murder, and ten years at hard labor for possession of a firearm by a convicted felon, with all three sentences to run concurrently.

Defendant now appeals his convictions and sentences, assigning eleven errors through counsel, and another four errors pro se. For the following reasons, Defendant's conviction and sentence for attempted first degree murder is affirmed; his conviction for terrorizing is reversed and the sentence is vacated; his conviction for possession of a firearm by a convicted felon is reversed and the sentence is vacated, and the matter is remanded for further proceedings.

**FACTS**

On July 30 and 31, 2005, Defendant made several telephone calls to the Alexandria Police Department threatening to shoot any officers who patrolled in his neighborhood. He also claimed to have explosives in his house and threatened some police officers by name. On the morning of August 1, he called for the chief of police and left an apologetic voicemail. However, in a subsequent voice message he renewed the threats. Later that day, Defendant became embroiled in an argument with his next-door neighbors. He armed himself with a rifle and began firing. The

1

victims retreated inside their home.  Defendant shot through a box fan mounted into their kitchen window and wounded one of the victims, Jerry Harrell, in the shoulder.

Police responded to the scene and laid siege to Defendant's house. Attempts to force him out with teargas were unsuccessful, so the authorities had his utilities cut off.  Shortly after midnight, he emerged from his house, and police took him into custody.

## SUFFICIENCY OF EVIDENCE

In his first three assignments of error, Defendant argues that the evidence that was submitted against him at trial was insufficient to support each of his three convictions.  Because each of these assignments of error involve the same or similar issues, we shall examine them together.  The analysis for such claims is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981).  It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review.  *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)).  In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

2

**First Degree Murder**

Defendant's most serious conviction was for attempted first degree murder.

First degree murder is defined by La.R.S. 14:30, which states, in pertinent part:

> A. First degree murder is the killing of a human being:
>
> . . . .
>
> (3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.

Attempt is defined by La.R.S. 14:27, which states, in relevant part:

> A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

Defendant argues that the State failed to prove that he had the intent to kill any of the victims. In response, the State asserts that specific intent to kill may be inferred from a defendant's act of aiming and firing a weapon at another person. *State v. Burns*, 98-602 (La.App. 1 Cir. 2/19/99), 734 So.2d 693, *writ denied*, 99-0829 (La. 9/24/99), 747 So.2d 1114.

Defendant's neighbor, Emma Harrell, one of the victims in this case, testified that Defendant aimed a .22-caliber rifle directly at her son, Jerry, and fired. Mrs. Harrell testified that the shots came so close to her that she "could feel the heat." When Mrs. Harrell and Jerry, and Jerry's girlfriend (his wife at the time of trial), Adrian, got inside their house, Jerry moved toward his mother, and a bullet hit him in the upper arm.

As we have noted, on direct examination, Mrs. Harrell testified that Defendant shot at her son, but the bullets came close to her. However, at the

3

beginning of cross-examination, she stated that Defendant aimed at her and her son.

Jerry testified that it was difficult to state exactly at whom Defendant was aiming

because Jerry, his mother, and his girlfriend were less than an arm's length from one

another. Adrian testified that Defendant shot at Jerry and also at Mrs. Harrell.

Further, Mrs. Harrell testified that at one point Defendant told her, "Emma, if you

don't get out of the way, the next bullet is going to be yours."

Based on that evidence, we look to the case of *State v. Smith*, 31,955, pp.

10-11 (La.App. 2 Cir. 5/5/99), 740 So.2d 675, 682, *writ denied*, 00-1404 (La.

2/16/01), 785 So.2d 840, which has a similar scenario to the instant case:

> Finally, the defendant contends that the state did not prove specific intent. Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Williamson*, 27,871 (La.App. 2d Cir.4/3/96), 671 So.2d 1208, *writ denied*, 96-1143 (La.10/4/96), 679 So.2d 1380; *State v. Maxie*, 93-2158 (La.4/10/95), 653 So.2d 526; *State v. Johnson*, 27,522 (La.App.2d Cir.12/6/95), 665 So.2d 1237.
>
> It is clear that the specific intent that is needed to support the defendant's conviction for first degree murder was established by the defendant taking a loaded assault rifle and shooting it multiple times into a house full of children, killing miraculously only one person. The defendant told the police he knew that the Cadillac containing the individuals who had shot at him earlier left the premises of the Johnson residence before he and Pickrom arrived with a loaded gun. The defendant admitted that he knew several children between the ages of 10 to 17 lived in that house. He also conceded that when he and Pickrom arrived at the house, no one was in the front yard, but he saw a light on inside of the house. The defendant clearly had specific intent. *State v. Butler*, 618 So.2d 572 (La.App. 2d Cir.1993), *writ denied*, 624 So.2d 1226 (La.1993).

The reasoning of *Smith* applies to this case. Defendant aimed and fired

at three people who were close together and continued to fire as they fled into the

4

house. Although Defendant's comment to Mrs. Harrell that she should get out of the way suggests he initially intended to shoot only Jerry, the same comment, combined with Mrs. Harrell's refusal to step aside, and Defendant's act of continuing to shoot, demonstrated that he had the specific intent to kill or inflict great bodily harm upon multiple victims.[1] Therefore, we find that there was sufficient evidence presented by the State to prove attempted first degree murder and that any rational trier of fact could have found that the essential elements of that crime were proven beyond a reasonable doubt. Accordingly, this assignment of error has no merit.

**Terrorizing**

La.R.S. 14:40.1 defines terrorizing as:

> [T]he intentional communication of information that the commission of a crime of violence *is imminent or in progress* or that a circumstance dangerous to human life exists or is about to exist, with the intent of causing members of the *general public* to be in sustained fear for their safety; or causing evacuation of a building, a public structure, or a facility of transportation; or causing other serious disruption to the *general public*.

(Emphasis added).

James Hay, the assistant chief of police, testified that on July 30, 2005, other officers consulted him regarding threatening calls from Defendant. Hay further testified that he was informed that Defendant called the Alexandria Police Department and threatened to kill any officer that patrolled in his neighborhood and

---

[1] We note that Mrs. Harrell also testified that "I could tell he wasn't his self because he was stumbling [sic]." However, the record does not indicate that Defendant lacked the capacity to form the mens rea necessary for attempted first degree murder. "Louisiana does not recognize the doctrine of diminished capacity. Therefore, a mental defect or disorder short of legal insanity cannot serve to negate specific intent[.]" *State v.* Bell, 543 So.2d 1013, 1019 (La.App. 3 Cir. 1989), *citing State v. Pravata*, 522 So.2d 606, 615 (La.App. 1 Cir.), *writ denied*, 531 So.2d 261 (La.1988). *See also State v. King*, 01-506, p. 12 (La.App. 3 Cir. 11/7/01), 799 So.2d 1241, 1247, *writ denied*, 01-3222 (La. 9/30/02), 825 So.2d 1190.

also told police that he had explosives in his house. Officers consulted Hay again the next day due to continued threatening calls made by Defendant, and Hay advised the shift commander to suspend normal patrols on Defendant's street. Hay also advised the head of the department's tactical team to conduct a night-time reconnaissance of Defendant's neighborhood. Events subsequently unfolded as previously described in this opinion. Thus, it is clear that Defendant's threats provoked a timely response from the police.

Defendant's primary argument on this issue is that he cannot be guilty as a matter of law because police officers are not members of the "general public." Before its amendment in 2001, La.R.S. 14:40.1 read, in pertinent part,

> Terrorizing is the intentional communication of information, known by the offender to be false, that the commission of a crime of violence is imminent or in progress or that a circumstance dangerous to human life exists or is about to exist, thereby causing *any person* to be in sustained fear for his or another person's safety; causing evacuation of a building, a public structure, or a facility of transportation; or causing other serious disruption to the *public*.

(Emphasis added).

Thus, the 2001 amendment of the statute appears to represent an effort to make the statute's application more restrictive, as the legislature replaced the term "any person" with "general public."

The State argues that police officers are "citizens first (members of the public) and officers by profession second." On the other hand, Defendant argues that various legislative enactments within the Criminal Code recognize police officers as being a special group of persons who receive special treatment. As example, he notes the provisions that prescribe punishment for first degree murder of a peace officer,

6

battery of a police officer, aggravated assault upon a peace officer with a firearm, unlawful use of a laser on a police officer, intentional exposure (of a police officer) to the AIDS virus, resisting an officer, and flight/aggravated flight from an officer. The State counters that a number of other groups benefit from the protections of various Criminal Code provisions but do not, thereby, lose their status as members of the public. As examples, the State mentions firefighters, school teachers, school or recreational contest officials, correctional facility employees, bus drivers, child welfare workers, and victims of domestic abuse.

We have found no case on point, but logic and practicality indicate that different individuals and different groups may or may not be members of the general public depending upon the context of the statute or regulation at issue, as it relates to the facts of a particular case. In other contexts, the general public would consist of people not involved in law enforcement. For example, in search and seizure cases, limitations on police activities are often juxtaposed with limitations (or lack thereof) on the activities of the general public. *See, e.g., State v. Bracken*, 506 So.2d 807, 812. (La.App 1 Cir.), *writ denied*, 511 So.2d 1152 (La.1987), which noted that "[s]ince the general public could peer into the interior of the vehicle" at issue, so could a police officer. *See also State v. Wallace*, 41,832, 41,837, 41,838, p. 5 (La.App. 2 Cir. 1/31/07), 950 So.2d 135, 138, which noted, "law enforcement officers have the same right as the general public to approach the entrance of a home."

In order to clarify the legislative intent behind the 2001 amendment, we obtained an audio CD of the committee hearing regarding HB 1944, the bill that led to the 2001 amendment of La.R.S. 14:40.1. Committee members did not discuss the

7

issue at hand, although there was some discussion of the statute's potentially broad application. We note that the original amendment that was discussed in committee still retained the term "any person," rather than "general public." The substitution of the term "general public" for "any person" and "public" was done by floor amendment, and legislative staff has advised us that there are no audio recordings of any relevant floor proceedings.

Further, we find guidance from the Second Circuit Court of Appeals in their case of *City of West Monroe v. Cox*, 511 So.2d 1200, 1202-03 (La.App. 2 Cir. 1987). In that case, our colleagues found that even though the disturbing the peace statute, La.R.S. 14:103, prohibits offensive speech toward "any other person:"

> Words spoken to a police officer such as "you g_____ d_____ m_____ f_____ I am going to [the Superintendent of Police] about this," and "You s_____ of a b_____, I'll choke you to death," without threatening conduct, have been held within the realm of protected free speech, even though the words are shocking to the sensibilities of others. A trained police officer is held to a "higher degree of restraint tha[n] the average citizen" to avoid physical retaliation even to words that might be categorized as "fighting words." See cases cited and discussed in *Malone v. Fields*, 335 So.2d 538, 541-542 (La. App. 2d Cir.1976), in *City of New Orleans v. Lyons*, 342 So.2d 196 (La.1977), and in *State in the Interest of W.B.*, 461 So.2d 366 (La.App. 2d Cir.1984).

Just as *Cox* set police officers apart from "average citizens" for the purposes of La.R.S. 14:103 under the facts of that case, the police officers in this case are set apart from the "general public" for purposes of La.R.S. 14:40.1 under the facts as they exist.

It is apparent that if the term "any person" had been left in the statute, then the statute would apply to the present case. However, it is our opinion that the legislature's decision to substitute the term "general public" represents an apparent

8

attempt to limit the application of the statute. Thus, this statute does not apply to the current factual scenario. Hay testified that he had concerns regarding Defendant's neighbors, but the evidence does not demonstrate that Defendant's threats were intended to place his neighbors in sustained fear, or to cause an evacuation, or disruption, in his neighborhood. Although police did conduct an evacuation, it was not initiated until police learned of the Harrell shooting.

We, therefore, find that because of the 2001 amendments of La.R.S. 14:40.1, police officers are not members of the general public under the statute in the instant case. The language of the statute contemplates criminal acts which place the entire general population in fear. It is sufficient to say that police officers are not left unprotected by our decision here. The State's evidence demonstrated that Defendant made threats with the apparent intent of influencing police officers' conduct in relation to their duties, i.e., patrolling his neighborhood. The public intimidation statute, La.R.S. 14:122, clearly covers such a situation and gives the protection of the law to the police officers who fall victim.

Accordingly, because we find merit in this assignment of error, Defendant's conviction is reversed, and his sentence for terrorizing is vacated and set aside.[2]

---

[2] We note that the record contains references to "the Millett case." Details are not in the record, but it is described as a shooting incident involving the police. We are aware of the widely reported incident a few years ago, in which two Alexandria police officers were killed by a suspect named Molette, who was also killed. Undoubtedly, Alexandria police officers remained aware of this incident, and the jurors did, as well. However, most of the facts of that incident are outside the record. Also, even if the officers involved in the current case felt greater fear of Defendant's threats because of the Molette incident, it would not change our conclusion that La.R.S. 14:40.1 does not apply to police officers in this case under the facts as presented.

**Possession of a Firearm by a Convicted Felon**

In his final argument under this assignment of error, Defendant attacks the sufficiency of the evidence supporting his conviction for possession of a firearm by a convicted felon. The relevant statute, La.R.S. 14:95.1, provides, in pertinent part:

> A. It is unlawful for any person who has been convicted of a crime of violence as defined in R.S. 14:2(B) which is a felony or simple burglary, burglary of a pharmacy, burglary of an inhabited dwelling, unauthorized entry of an inhabited dwelling, felony illegal use of weapons or dangerous instrumentalities, manufacture or possession of a delayed action incendiary device, manufacture or possession of a bomb, or any violation of the Uniform Controlled Dangerous Substances Law which is a felony, or any crime which is defined as a sex offense in R.S. 15:541(14.1), or any crime defined as an attempt to commit one of the above-enumerated offenses under the laws of this state, or who has been convicted under the laws of any other state or of the United States or of any foreign government or country of a crime which, if committed in this state, would be one of the above-enumerated crimes, to possess a firearm or carry a concealed weapon.
>
> . . . .
>
> C. Except as otherwise specifically provided, this Section shall not apply to the following cases:
>
> (1) The provisions of this Section prohibiting the possession of firearms and carrying concealed weapons by persons who have been convicted of certain felonies *shall not apply to any person who has not been convicted of any felony for a period of ten years from the date of completion of sentence, probation, parole, or suspension of sentence.*

(Emphasis added) (footnote omitted).

Defendant argues that the State had the burden of proving beyond a reasonable doubt that his sentence was not completed ten years prior to the offense, and that it failed to carry said burden of proof. It is well-settled that the ten-year prescriptive period is an element of the offense.

10

Defendant acknowledges a 1988 guilty plea that resulted in a two-year term of probation. Also, minutes introduced by the State show that Defendant's probation was extended for one year. It is Defendant's position that his probation should have expired no later than September 18, 1991. The State alleges that the offenses in the present case occurred between July 30 and August 2, 2005.

Further, the State contends that Defendant's probation did not expire in 1991 because a probation revocation warrant was issued on May 29, 1991. He was not arrested on the warrant until February 6, 1995, and the revocation hearing was not conducted until March 18, 1996. The State argues that the ten-year prescriptive period did not begin to run until the latter date, and thus, La.R.S. 14:95.1 applies to the present case.

In response to the State's argument, Defendant claims that because he was arrested–apparently on an unrelated matter–and released in 1993, his probationary period did not continue until 1996. According to Defendant, the State's failure to execute the warrant in 1993 shows a lack of due diligence on its part. The State suggests, or at least implies, that the 1993 arrest had no effect whatsoever on the running of the probationary period. We have found no jurisprudence squarely addressing this issue.

Although the ten-year prescriptive period is an element of the crime, the particular issue of the possible effect of Defendant's 1993 arrest on the status of his probation was a legal question. Thus, the issue should have gone before the trial court in a motion to quash because it was not a fact question that could be resolved by the jury. Therefore, it is not a matter suited for analysis within the context of the

11

*Jackson* review we are conducting in these assignments of error and would, therefore, lack merit in the current context.

We do observe that the relevant statute, La.Code Crim.P. art. 899(D), states: "When a warrant for a defendant's arrest or a summons for defendant's appearance is issued under Paragraph A or a detainer is issued under Paragraph B of this Article, *the running of the period of probation shall cease as of the time the warrant, summons, or detainer is issued*." (Emphasis added). Prior to 1985, the provision read: "When a warrant for a defendant's arrest, issued under Paragraph A, *cannot be executed*, the defendant shall be deemed a fugitive from justice and the running of the period of probation shall cease as of the time the warrant was issued." (Emphasis added).

Thus, we find that the elimination of language relative to execution of a warrant, detainer, or summons, indicates a legislative intent that the suspension of the running of a defendant's probationary period should continue despite intervening incarceration. However, the possibility remains that the lengthening of Defendant's probationary period under Article 899 could have violated his constitutional due process rights due to an unreasonable delay in execution. *See, e.g., State v. Langley*, 95-1489 (La. 4/14/98), 711 So.2d 651; *State v. Newman*, 527 So.2d 1036 (La.App. 2 Cir.), *writ denied*, 533 So.2d 356 (La.1988). As we have noted above, the State argues that Defendant's probationary period did not expire until 1996, approximately five years after it normally would have run. Further, Defendant alleges that he was arrested in 1993, a fact which could have an effect on a due process analysis. However, since this is a purely legal issue and, thus, has no bearing in our current

12

*Jackson* review, it lacks merit in this context.[3] Nonetheless, we will re-visit the issue where Defendant raises it in the next assignment of error.

## MOTION TO QUASH

As with his first three assignments of error, Defendant combines these assignments in his brief. First, he argues that the trial court erred by summarily denying his pre-trial motion to quash and that this court erred in denying his pre-trial application for review of that ruling. On December 19, 2005, Defendant filed a motion to quash alleging that his period of probation that we discussed in the previous assignment of error was completed more than ten years before the offense at issue. On the same date, the trial court wrote its denial on Defendant's motion without giving reasons. On January 25, 2006, this court denied review in an unpublished opinion bearing docket number 06-12. In our denial,we cited *State v. Byrd*, 96-2302, pp. 18-19 (La. 3/13/98), 708 So.2d 401, 411, *cert. denied*, *sub nom*, 525 U.S. 876, 119 S.Ct. 179 (1998), which held:

> A motion to quash is, essentially, a mechanism whereby pre-trial pleas are urged, i.e., pleas which do not go to the merits of the charge. At a hearing on such a motion, evidence is limited to procedural matters and the question of factual guilt or innocence is not before the court. La.C.Cr.P. art. 531 *et. seq.*; *State v. Rembert*, 312 So.2d 282 (La.1975); *State v. Patterson*, 301 So.2d 604 (La.1974).
>
> In considering a motion to quash, a court must accept as true the facts contained in the bills of information and in the bill of particulars, and determine as a matter of law and from the face of the pleadings, whether a crime has been charged; while evidence may be adduced, such may not include a defense on the merits. *State v. Gerstenberger*, 260 La. 145, 255 So.2d 720 (1971); *State v. Masino*, 214 La. 744, 750, 38 So.2d 622 (1949) ("the fact that defendants may have a good defense is not sufficient grounds to quash the indictment").

---

[3] Similarly, Defendant's arguments in his reply brief regarding statutory construction lack merit.

13

Thus, our ruling deferred Defendant's argument to the merits. We note that Defendant's motion did not raise the specific issue now raised by appellate counsel, i.e., the possible effect of his 1993 arrest on the length of his probation period. The motion presented only the general question of whether the ten-year prescriptive period in La.R.S. 14:95.1 had run. In that regard, our denial of the writ was correct under the circumstances.

At trial, Defendant wanted to present evidence to show that the State did not act with due diligence to execute the probation-violation warrant against him when he was arrested in 1993. The trial court barred such evidence, expressing the view that Defendant was attempting to present an issue of law to the jury and that the argument should have been raised in a motion to quash. For the reasons we discussed earlier in our *Jackson* review, we find that the trial court was correct in its ruling. As we explained, Defendant's argument had no merit under the relevant statute. His argument only had potential merit as a constitutional matter, but this would be an issue of law to be decided by the judge rather than the jury. Further, as we have said, Defendant failed to raise the specific issue of the effect of the State's warrant–or of due diligence in its execution–in his motion to quash. For these reasons, this argument lacks merit.

## JURY INSTRUCTIONS

Defendant argues that the trial court erred by refusing to give special jury instructions regarding the ten-year "cleansing period" of the possession of a firearm by a convicted felon charge. The trial court ruled that the matter was a question of

14

law, and trial counsel objected. Again, this argument lacks merit for the reasons discussed regarding his previous assignment of error.

The State argues that Defendant is improperly trying to collaterally attack the predicate conviction and sentence. However, Defendant's arguments merely relate to the prescriptive period set forth in La.R.S. 14:95.1 and do not improperly collaterally attack the predicate offense.

Defendant also attacks the jury instruction the trial court gave, arguing that it misstated an element of the crime. The trial court said:

> As to Count III, that is being a convicted felon in possession of a firearm, the statute says it is unlawful for any person who's been convicted of a violation of the Uniform Controlled Dangerous Substances Law, which is a felony to possess a firearm. The possession of firearms and carrying concealed weapons by persons who have been convicted of certain felonies shall not apply to any person who's been convicted of any felony for a period of ten years from the date of completion of sentence, probation, parole or suspension of sentence.

> Thus, in order to convict the defendant of a -- being a convicted felon in possession of a firearm you must find: (1) That he was in possession of a firearm; (2) That he was convicted of a violation of the Uniformed Controlled Dangerous Substances Law that was a felony; and (3) That there had been a period of ten years from the completion of sentence, probation or parole or suspension of sentence.

The explanation given by the court is incorrect, as La.R.S. 14:95.1(C)(1) states:

> The provisions of this Section prohibiting the possession of firearms and carrying concealed weapons by persons who have been convicted of certain felonies shall not apply to any person who has *not* been convicted of any felony for a period of ten years from the date of completion of sentence, probation, parole, or suspension of sentence.

(Emphasis added).

15

Defendant acknowledges that he failed to lodge a contemporaneous objection as required by La.Code Crim.P. art. 841. However, Defendant argues that he was "obviously prejudiced" by the erroneous instruction. On the other hand, he also appears to treat the issue as an ineffective assistance of counsel claim, which we will address more fully hereinafter.

Due to the lack of contemporaneous objection, we are required to find that the assignment lacks merit. *See State v. Howard*, 98-0064 (La. 4/23/99), 751 So.2d 783, *cert. denied*, 528 U.S. 974, 120 S.Ct. 420 (1999). *See also State v. Belgard*, 410 So.2d 720 (La.1982). In *Howard*, the supreme court explained:

> As an initial matter, defendant's trial counsel did not object to the instruction at trial, and thereby waived any claim based on it. La.C.Cr.P. art. 841; *[State v.] Taylor*, [93-2201 (La. 2/28/96)], 669 So.2d [364] at 367-69; *[State v.] Harris*, 383 So.2d [1 (La.1980] at 10-11. Although Louisiana courts have sometimes waived the contemporaneous objection rule, *see State v. Williamson*, 389 So.2d 1328, 1331 (La.1980) (an error involving "the very definition of the crime of which defendant was in fact convicted . . . is of such importance and significance as to violate fundamental requirements of due process"), this Court has also on two occasions explicitly cautioned that *Williamson* did not establish jurisprudentially the equivalent of a "plain error" rule created by F.R.Crim.P. 52(b). *State v. Arvie*, 505 So.2d 44, 48 (La.1987); *State v. Thomas*, 427 So.2d 428, 435 (La.1982) (on rehearing) (*Williamson* "should not be construed as authorizing appellate review of every alleged constitutional violation and erroneous jury instruction urged on appeal without timely objection at occurrence."); *see also Belgard*, 410 So.2d 720, 727 (La.1982) (to preserve issue of erroneous instruction on elements of attempted second degree murder, defendant must have objected to the charge at trial). At any rate, defendant's claim fails on the merits.

*Id.* at 804.

We note that the First Circuit Court of Appeal has also discussed the viability of *Williamson* in detail. The first circuit observed:

16

However, according to the record before us, the defendant's trial counsel did not object to the erroneous instructions given by the trial court. Thus, the defendant ordinarily is precluded from raising such an alleged error for appellate review. LSA-C.Cr.P. arts. 801 and 841. Nevertheless, exceptions to this rule have been made in individual cases where there have been fundamentally erroneous misstatements of the essential elements of the charged offense. In such cases, the Louisiana Supreme Court has adopted the view that such fundamentally incorrect jury instructions so affect the fairness of the proceedings and the accuracy of the fact-finding process that due process of law requires reversal, even in the absence of compliance with legislative procedural mandates. See *State v. Williamson*, 389 So.2d 1328, 1331 (La.1980); *State v. Johnson*, 98-1407, p. 10 (La.App. 1st Cir.4/1/99), 734 So.2d 800, 807, writ denied, 99-1386 (La.10/1/99), 748 So.2d 439.

Whether an appellate court can continue to make a *State v. Williamson* analysis and review such a matter on direct appeal is now in doubt, in light of the supreme court's statement in *State v. Hongo*:

Although this case is before us via post-conviction proceedings because of trial counsel's failure to object, we note that because we find that the instant error is not structural, it necessarily is not of such significance as to violate fundamental requirements of due process, See *State v. Williamson*, 389 So.2d 1328 (La.1980), and thus a defendant must make a contemporaneous objection in order to preserve the error for direct review. *State v. Thomas*, 427 So.2d 428, 435 (La.1982) (on rehearing) (limiting *Williamson* as it "should not be construed as authorizing appellate review of every alleged constitutional violation and erroneous jury instruction urged first on appeal without timely objection.")

*State v. Hongo*, 706 So.2d at 422, n. 3. Nevertheless, we find it unnecessary to resolve the issue in the case now before the court, having found reversible error on another basis. Consequently, we pretermit this assignment of error.

*State v. Woods*, 00-2147, pp. 18-19 (La.App. 1 Cir. 5/11/01), 787 So.2d 1083, 1096-97, *writ denied*, 01-2389 (La. 6/14/02), 817 So.2d 1153.

In *State v. Falcon*, 06-798 (La.App. 5 Cir. 3/13/07), 956 So.2d 650, the fifth circuit cited both *Hongo* and *Williamson*, and then addressed a faulty jury

17

instruction despite the absence of a contemporaneous objection. However, the instruction in *Falcon* was easily disposed of as harmless error. While the possible error here is potentially more complex, we find that the failure to timely object did not allow the trial court to correct the obvious error and that this assignment of error lacks merit. However, we shall revisit this issue in our discussion of Defendant's ineffective assistance of counsel claim, wherein he argues several deficiencies in trial counsel's performance relating to the ten-year prescriptive period.

## REMOVAL OF THE JURY

In this assignment of error, Defendant claims that the record fails to show that the jury was removed before the hearing regarding the voluntariness of his statement to police. This assertion was correct regarding the transcript; however, the minutes clearly stated that the jury was removed before the hearing, and the context of the transcript suggested the minutes were correct. We contacted the district court clerk's office and obtained a corrected record page that shows that the jury was removed before the voluntariness hearing.

Therefore, this assignment of error has no merit, because it lacks a factual basis.

## FREE AND VOLUNTARY CONFESSION

In this assignment of error, Defendant argues that the trial court erred in concluding that his statement to Detective Cedric Green was free and voluntary. The relevant statute, La.R.S. 15:451, prescribes that "[b]efore what [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was

free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." The analysis is well-settled:

> In considering the admissibility of a statement, it is well settled that the State must bear the burden of demonstrating a defendant's knowing and intelligent waiver of his or her privilege against self-incrimination and the right to counsel. *State v. Vigne*, 01-2940 (La.6/21/02), 820 So.2d 533, *quoting*, *Tague v. Louisiana*, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980). Furthermore, La.R.S. 15:451 specifically states that before a confession can be introduced, "it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." A trial court's determination regarding the admissibility of a statement is to be given great weight and will not be disturbed by a reviewing court unless it is clearly unsupported by the evidence. *Vigne*, 820 So.2d 533.

*State v. Chesson*, 03-606, p. 7 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 173, *writ denied*, 03-2913 (La. 2/13/04), 867 So.2d 686. The jurisprudential deference to trial courts' admissibility rulings includes their determinations regarding weight and credibility of evidence. *State v. Brown*, 03-0897 (La. 4/12/05), 907 So.2d 1, *rehearing granted in part on other grounds*, 03-0897 (La. 6/29/05), 907 So.2d 36.

In the present case, Detective Green, who had known Defendant for some time before the incident at issue, testified that he read Defendant his Miranda rights and that Defendant signed a waiver of rights form. Detective Green said he did not threaten, intimidate, or coerce Defendant in any way to obtain the confession. He testified that he did not make any promises to Defendant, that Defendant appeared to be a person of normal intelligence, and that he was not drugged or intoxicated when he gave the confession. Further, Detective Green noted that Defendant was communicative that night and "[a]ctually, he didn't want me to leave him. He didn't

19

even want me to go to -- to the -- to get some water. He wanted me to stay in the room with him."

Defendant now claims that a number of factors may have clouded his judgment, such as lack of sleep, lack of diabetes medication, exposure to teargas, and being tazered after he surrendered to police. These matters were addressed, in large part, during Defendant's cross-examination of Detective Green. According to Detective Green, the siege of Defendant's home lasted from noon until 1:00 a.m. the following morning. However, Detective Green said that Defendant was coherent and did not have any effects of the teargas. He said that Defendant wanted something to eat and was given food and drink.

Defendant testified regarding the voluntariness of his statement. He claimed not to remember giving Detective Green the statement. Further, he testified that he had not taken his diabetes medication for "two or three weeks" before the incident at issue, that said lack of medication made his blood sugar levels drop, and that such a drop in his blood sugar typically rendered him "very incoherent." He also testified that he had smoked marijuana before noon on the date of the incident. However, he acknowledged that he had seen and spoken to Detective Green, that another officer was present, and that he was given fruit and water. He also acknowledged that he was not beaten or threatened and that he did not feel intimidated.

Defendant points out the well-settled principle that appellate review of a trial court's ruling on a motion to suppress may include other evidence introduced

20

at trial.  With that in mind, we listened to the audiotape of Defendant's statement, and it appears that Defendant sounded coherent during the interview.

The trial court apparently found Detective Green more credible than Defendant.  When we view the evidence in light of *Chesson* and *Brown*, we find that no error occurred, and this assignment of error lacks merit.

## SELF REPRESENTATION

In this assignment of error, Defendant asserts that the trial court erred by denying his request to represent himself at trial.  Before the State called its first witness, the following colloquy occurred:

DEFENSE COUNSEL:

> And, Mr. Brown, I think, wanted to make a statement or say something to the Court.  He was raising his hand.  Now is as good a time as any.

THE COURT:

> Go ahead, Mr. Brown.  You had something you wanted to say, sir?

DEFENDANT:

> Yes.  Your Honor, at this time I'm ready to revoke [sic] my right to self-counsel.

THE COURT:

> To what?

DEFENDANT:

> To self-counsel.

THE COURT:

> No, sir.  It's too late for that.  You can't in the beginning -- in the middle of trial want to represent yourself.

21

Why is that you want to represent yourself, sir?

DEFENDANT:

Because me and my counsel have a conflict.

THE COURT:

Why do you and your counsel have a conflict?

DEFENDANT:

Because me and my counsel did not -- a lot of the stuff, I know nothing about. I have not been informed to [sic].

I think I wrote you a request before about me and counsel not being able to collaborate on my defense, and you had me remanded to DC1 in order to do this.

And I informed you a second time that me and counsel was having a problem communicating. And now I'm -- I have stuff in front of me that I have not -- that I know nothing of, that my counsel just refused to -- my counsel refused to subpoena witnesses that I gave him a list of.

My counsel just told me that if I didn't know about this, it's not his fault.

THE COURT:

All right.

DEFENSE COUNSEL:

Your Honor, I'd like to make a statement.

Mr. Brown did request witnesses. We made contact with all but one of them. One was a -- a U.S. -- one of the -- a Federal Marshal, but none of these witnesses had anything to do or were anyway involved in the incident that we're talking about today. I told that to Mr. Brown in writing, if my memory serves me, at least two months ago, and I will produce that letter --

THE COURT:

No, that's okay.

22

DEFENSE COUNSEL:

> I told him that I was not going to subpoena these witnesses, that if he wanted to take action on his own, he was free to do so. But I was not going to do it, and I was not going to call these witnesses.

THE COURT:

> Typically, the problem is the defendants want witnesses subpoenaed to testify about certain things that are not relevant and the Judge doesn't allow it. And the lawyer says, no, I'm not going to do that because it's not relevant to what we're talking about. And they get upset that their subpoenas aren't testified -- I mean, aren't subpoenaed -- their witnesses are not subpoenaed.

> So that's what you're saying happened in this case?

DEFENSE COUNSEL:

> That's correct, Your Honor.

> And -- and as far as communicating with counsel, it is Mr. Brown's obligation to do the communicating.

> Mr. Brown has been studious in his efforts to not cooperate with me at all.

THE COURT:

> All right. Mr. Brown, your request is denied, sir.

Both parties cite *State v. Hypolite*, 04-1658 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, *writ denied*, 06-0618 (La. 9/22/06), 937 So.2d 381. In that case, we wrote:

> Hypolite also argues that the trial court erred by denying him his constitutional right to represent himself. He argues that the court applied the wrong standard in denying his motion for self-representation.

> In support of his position, Hypolite cites *State v. Santos*, 99-1897, p. 3 (La.9/15/00), 770 So.2d 319, 321, in which the supreme court explained:

23

A trial judge confronted with an accused's unequivocal request to represent himself need determine only whether the accused is competent to waive counsel and is "voluntarily exercising his informed free will." *Faretta* [*v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)] 422 U.S. at 835, 95 S.Ct. at 2541. In this context, "the competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself." *Godinez v. Moran*, 509 U.S. 389, 399, 113 S.Ct. 2680, 2687, 125 L.Ed.2d 321 (1993) (footnote omitted).

In the present case, the trial court and court of appeal therefore erred in assessing relator's competence to waive counsel according to a standard appropriate for measuring the competence of counsel against professional norms. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

In the present case, the "Faretta Hearing" was not held until the State was about to call its final witness in its case-in-chief. In proceedings conducted outside the presence of the jury, the court questioned Hypolite with regard to his ability to represent himself. Upon being asked by the court whether he understood that he did not know how to try a case, Hypolite responded that it "shouldn't be too hard." Hypolite stated that he felt he could represent himself, in spite of being informed of the complexities of trying cases. He asserted that he needed to represent himself because his lawyers would not ask the questions he wanted asked. Hypolite opined that all it would take to represent himself would be common sense. The court denied the request stating that:

You're not prepared to represent yourself. You have shown no indication to me that you have experience in being in court to watch cases. You have no experience in being tried before. You disagree with your lawyers about some things, so you think you're going to represent yourself. And then of course after you represent yourself and if you get convicted, you're going to complain because you weren't capable of representing yourself. And in my opinion, you're not capable of representing yourself. I deny your request to represent yourself. Have a seat.

It appears that the trial court did not apply the appropriate standard in evaluating Defendant's motion as set out in *Santos*. However, as the State points out, the present case is . . . distinguishable

24

from *Santos*, because Hypolite did not move to represent himself until the State had nearly completed its case-in-chief. He had made earlier attempts to have his two appointed attorneys dismissed, but appeared to want new counsel appointed. Hypolite did not unequivocally move to represent himself until the middle of the trial.

In arguing an oral motion to dismiss his attorneys, made earlier in the trial, Hypolite stated to the court, "I need a new lawyer to represent me because the lawyer I have said I'm guilty already." This was not a request to represent himself since Defendant's language shows he was asking for new counsel.

The State cites *State v. Bridgewater*, 00-1529, pp. 19-20 (La.1/15/02), 823 So.2d 877, 895, *modified on rehearing*, 00-1529 (La.6/21/02), 823 So.2d at 909, *cert. denied*, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003), which explained that:

> Substantively, defendant's request to represent himself was not an unequivocal one; rather, it was an obfuscated request to substitute appointed counsel because of his disagreement with current counsel's choice of trial strategy. Addressing a similar request, the federal court in [*U.S. v.*] *Frazier-El* [204 F.3d 553 (4th Cir.), *cert. denied*, 531 U.S. 994, 121 S.Ct. 487, 148 L.Ed.2d 459 (2000) ], *supra*, reasoned:
>
> > A trial court must be permitted to distinguish between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel. The circumstances surrounding Frazier-El's purported waiver of his right to counsel and the assertion of his right to proceed without counsel in this case suggest more a manipulation of the system than an unequivocal desire to invoke his right of self-representation. Taking the record as a whole, we are satisfied that the district court was justified, when confronted with Frazier-El's vacillation between his request for substitute counsel and his request for self-representation, in insisting that Frazier-El proceed with appointed counsel.

204 F.3d at 560 (internal citations omitted).

Although the defendant argues that this Court's decision in *State v. Santos*, 99-1897 (La.9/15/00), 770 So.2d 319, is controlling, that case is easily distinguishable.  In *Santos*, *supra*, the defendant made an unequivocal request to discharge his court-appointed counsel and to represent himself, explaining that he feared "'the Indigent Defender Board is working with the police of St. Bernard Parish to keep me here.'"  99-1897 at p. 3, 770 So.2d at 321.  Unlike the defendant in *Santos* who was convinced that no public defender could serve his interests, in this case defendant specifically stated that it was current counsel with whom he was dissatisfied.  Two other factors we relied upon in *Santos* were that the defendant (i) unequivocally asserted his right to represent himself, and (ii) made that request "under circumstances which precluded a finding that he was simply engaged in dilatory tactics."  99-1897 at p. 4, 770 So.2d at 322.  Neither factor is present here.

First, defendant's request was not clear and unequivocal; rather, defendant's request was, like in *Frazier-El*, *supra*, "a manipulative effort to present particular arguments" and vacillated between self-representation and representation by counsel.  Second, given that defendant raised similar arguments before (a point discussed below) and that he sought a continuance on the eve of trial, this clearly could be characterized as a "dilatory tactic."

The *Bridgewater* court also found that the trial judge applied the correct legal standard to the defendant's request to represent himself.  It explained that the lower court considered matters bearing upon the defendant's competence to waive, even though it also noted factors related to his competence to represent himself.  *Id.*  In this regard, *Bridgewater* is distinguishable from the present case.  However, *Bridgewater* also demonstrates an independent basis for rejecting Hypolite's claims.  That basis, the dilatory and manipulative nature of the motion, found in both *Bridgewater* and this case, distinguishes both of them from *Santos*.

The *Santos* court observed that a defendant's right to self-representation is entitled to great respect and protection from the courts, stating:

> The trial court therefore erred in denying relator his Sixth Amendment right to self-representation and the error is not subject to harmless-error analysis. [*McKaskle v.*] *Wiggins*, [465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ] 465 U.S. at 177, n. 8, 104 S.Ct. at 950 ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome

unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless.").

*Santos*, 770 So.2d 319, 322.

However, under *Bridgewater's* reasoning, a defendant's attempt to use the right to self-representation as a tool of delay or manipulation puts him outside the protections afforded to genuine attempts to assert the right. This is a long-standing principle in Louisiana jurisprudence. *See, e.g., State v. Hegwood*, 345 So.2d 1179 (La.1977).

As noted earlier, Hypolite did not move to represent himself until the State's case-in-chief was nearly complete. Therefore, the timing of the request indicates that it was merely a delay tactic. Much like the defendant in *Bridgewater*, Hypolite made earlier attempts to obtain *substitute* counsel, apparently due to disagreements regarding trial strategy. However, he did not clearly ask to represent himself until the State was about to call its last witness in its case-in-chief. As a result, his request appears to be "a manipulative effort to present particular arguments" rather than "a sincere desire to dispense with the benefits of counsel." *Bridgewater*, 823 So.2d 877, 895, *quoting U.S. v. Frazier-El*, 204 F.3d 553, 560 (4th Cir.), cert. denied, 531 U.S. 994, 121 S.Ct. 487, 148 L.Ed.2d 459 (2000). Therefore, we find no error in the trial court's refusal to allow Hypolite to represent himself.

*Id.* at 1280-83.

In this case, Defendant is in a position similar to Hypolite's since he did not ask to represent himself until after trial had begun. On November 10, 2005, Defendant filed a pro se motion seeking to be appointed as co-counsel. At a pre-trial hearing on November 18, 2005, Defendant complained that he was not having enough personal communication with trial counsel. However, he did not ask to represent himself, to act as co-counsel, or to replace his trial counsel, and the trial court did not specifically address the issue. The trial court advised Defendant that it was not

27

required to consider any of his pro se motions since he was represented by counsel.[4] On December 2, 2005, the trial court denied Defendant's written motion with the notation, "Moot. Matter was heard on Friday November 18, 2005."

On December 13, 2005, Defendant filed a pro se motion for new counsel, and the trial court held a hearing thereon on January 30, 2006. Defendant again complained about having trouble contacting his trial counsel. The trial court stated it would "raise the issue" with trial counsel, who was not present at the hearing, and denied Defendant's motion.

Although the record does not contain another written motion for appointment of new counsel, the trial court held another hearing on such a request on May 26, 2006. Defendant repeated his allegations that trial counsel was unresponsive and/or uncommunicative. Defense counsel gave the trial court explanations for the problems; for example, he said that the State's witnesses would not talk to him. He also stated that he had met with Defendant, at a jail facility for more than an hour, and that Defendant had "been less than cooperative." The trial court denied the motion to appoint new counsel, but Defendant did not ask to represent himself.

As we noted earlier, Defendant is in a position similar to that of the defendant in *Hypolite*. While his motion to represent himself came earlier in the trial process than Hypolite's did, it still did not come until after trial began. The jury had already been selected and sworn. As in *Hypolite*, Defendant's pre-trial motions sought new counsel, or co-counsel status, rather than self-representation.

---

[4] This ruling was incorrect pursuant to *State v. Melon*, 95-2209 (La. 9/22/95), 660 So.2d 466, discussed below.

Further, as the State points out, there is another passage in the record that suggests Defendant was pursuing manipulative, or at least dilatory, actions at trial. At the close of his testimony regarding the admissibility of his statement to police, the trial court noted for the record that Defendant had initially refused to leave his cell that day, claiming that he was sick, and that he had not received his blood sugar medication. According to the trial court, a search of Defendant's prison locker revealed two hundred of his blood sugar pills. When confronted with this discovery, he admitted to not taking his medicine.

Defendant also complains that the trial court erred by refusing to consider his pro se pre-trial "motion for appeal," filed January 10, 2006. In its written denial, the trial court stated that Defendant had counsel and had been ordered not to file any pro se motions. The trial court cited *State v. Guidry*, 94-607 (La.App. 3 Cir. 12/7/94), 647 So.2d 511.

As Defendant points out, *Guidry* is not good law. The supreme court has stated,

> We further direct that the lower courts must also accept and consider filings from represented defendants in a pre-verdict context whenever doing so will not lead to confusion at trial. See, [e.]g*., State v. Sabella*, 94-1919 (La. 8/12/94), 642 So.2d 1271; *State v. Terry*, 94-1493 (La. 7/5/94), 639 So.2d 1186. All courts retain the discretion to grant or withhold co-counsel status, after or before verdict. *State ex rel. Spitz v. State*, 94-0792 (La. 4/22/94), 637 So.2d 149; *State v. McCabe*, 420 So.2d 955, 957 (La.1982).

*State v. Melon*, 95-2209, p. 1 (La. 9/22/95), 660 So.2d 466, 477. However, the trial court's reliance on *Guidry* is moot. The matter that Defendant wanted to raise, i.e., the December 19, 2005 denial of his pro se motion to quash, was considered by this

29

court in the unpublished writ bearing docket number 06-12, discussed earlier. As previously noted, the trial court correctly denied the application on January 25, 2006.

Therefore, based on the facts present in this case when viewed in light of *Hypolite*, we find that this assignment of error lacks merit.

## JUROR REMOVAL

In this assignment of error, Defendant argues that the trial court erred by dismissing two jurors without a hearing, one of them without Defendant being present. However, as the State points out, the record indicates that Defendant failed to lodge a contemporaneous objection to either dismissal. The State cites *State v. Howard*, 31,807 (La.App. 2 Cir. 8/18/99), 746 So.2d 49, *writ denied*, 99-2960 (La. 5/5/00), 760 So.2d 1190 (*citing State v. Sherman*, 630 So.2d 321 (La.App. 5 Cir. 1993), *writ denied*, 94-0258 (La. 5/6/94), 637 So.2d 1046), which held that La.Code Crim.P. art. 841 barred the defendant from arguing that the trial court erred by conducting part of the voir dire outside his presence. The State also notes *State v. Broaden*, 99-2124 (La. 2/21/01), 780 So.2d 349, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192 (2001), which held similarly. Further, *State v. Tolliver*, 32,859 (La.App. 2 Cir. 3/1/00), 753 So.2d 958, *writ denied*, 00-2028 (La. 3/30/01), 788 So.2d 440, applied La.Code Crim.P. art. 841 to a defendant's argument that a juror had fallen asleep near the beginning of trial during the State's case.

Defendant relies upon *State v. Tennors*, 05-538 (La.App. 3 Cir. 2/15/06), 923 So.2d 823, in which this court reversed a defendant's convictions for aggravated burglary and simple burglary because the trial court failed to hold an evidentiary hearing before dismissing a juror. However, the defendant in that case lodged a

30

timely objection at trial and apparently moved for mistrial as well. Thus, *Tennors* does not negate the fact that Defendant in the present case failed to preserve the issue. Further, Defendant raises *State v. Grogan*, 98-98 (La.App. 3 Cir. 12/9/98), 723 So.2d 1049, in which we recognized as error patent a defendant's exclusion from an in-chambers conference in which three prospective jurors were questioned. Although the defendant's counsel was present and questioned the prospective jurors, we held that the error was not harmless and reversed the defendant's conviction for distribution of cocaine. While this court recognized the issue as an error patent, we note that at that trial, the defendant specifically requested to attend the in-chambers conference, and when the trial court excused all three prospective jurors for cause, trial counsel objected regarding two of them.

In both *Grogan* and *Tennors*, the defendants clearly objected to the proceedings at issue. Certainly, a defendant may acquiesce to the kind of juror removal or substitution at issue in the present case. Defendant may have seen a strategic benefit in the court's actions or may have agreed that the original jurors were properly removed due to family emergencies. Therefore, we hold that Defendant failed to preserve this issue due to the lack of a contemporaneous objection. However, as we have mentioned in earlier assignments of error, we will revisit Defendant's concerns in the next assignment of error which alleges ineffective assistance of counsel. Accordingly, for the reasons discussed above, this assignment of error lacks merit.

31

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant states in his last assignment of error filed by appellate counsel, "[I]n the alternative, if any of the errors alleged in the preceding Assignments of Error are held to be procedurally barred, the failure of trial counsel to object, either at trial or by filing the appropriate motions pre-trial or post-trial, constitutes ineffective assistance of counsel." Defendant has also filed a pro se brief assigning four errors. The first two assignments of error generally echo appellate counsel's arguments under this assignment of error.

The analysis for ineffective assistance claims is well-settled:

> In order to prove that counsel was ineffective, the defendant must meet the two-pronged test enunciated by the Supreme Court. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that this deficiency prejudiced the outcome of the trial. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Brooks*, 505 So.2d 714 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).

*State v. James*, 95-962, pp. 4-5 (La.App. 3 Cir. 2/14/96), 670 So.2d 461, 465. Ineffective assistance claims are usually addressed in the post-conviction process. However, such claims may be addressed on appeal if the record contains evidence sufficient for analysis. *State v. Seiss*, 428 So.2d 444 (La.1983). We have done just that recently in the case of *State v. Roberson*, 05-1206 (La.App. 3 Cir. 3/1/06), 924 So.2d 1201, where on appeal we overturned a first-degree robbery conviction due to trial counsel's failure to object to the admission of a letter related to plea negotiations.

Defendant first contends that trial counsel was remiss by failing to file a motion to quash or by failing to adopt Defendant's pro se motion to quash that we discussed earlier in this opinion. Trial counsel also failed to seek review of the denial

32

of Defendant's pro se motion. As observed in the *Jackson* review, Defendant filed a pre-trial motion to quash, pro se, arguing that ten years had elapsed since the end of his period of probation on an earlier conviction. The trial court denied the motion without reasons. The minutes show that Defendant was already represented by trial counsel when he filed the pro se motion on December 19, 2005. We have already concluded that this court was correct in denying the motion *as presented*. We found that Defendant, working pro se, failed to raise the specific issue of whether his period of probation was completed more than ten years before the present offenses due to the State's possible lack of due diligence in executing the probation warrant. In failing to adopt the motion, trial counsel also failed to raise the issue pre-trial.

As discussed in the *Jackson* review, there is a viable argument that the State should have or could have served the probation revocation warrant on Defendant when he was incarcerated in 1993. Further, this argument rests upon well-established constitutional law. Thus, trial counsel should have been aware of it. In fact, as noted in an earlier assignment of error, trial counsel must have been aware of the issue as he tried to raise it at trial. Further, the general issue of whether the cleansing period had expired should have been brought to his attention by Defendant's pro se efforts. Also, there is a serious question as to whether counsel's pre-trial inaction was a reasonable trial strategy, as it forfeited a potentially meritorious issue that could have quashed a charge. Therefore, we hold that trial counsel's failure to raise the issue constituted deficient performance. Accordingly, we will proceed to the second step in the *Strickland* analysis, i.e., whether trial counsel's deficient performance prejudiced Defendant's case.

33

At the heart of this issue is the fact that trial counsel's inaction placed Defendant in a quandry. As just noted, Defendant's pro se motion, which came close to raising a viable issue, was denied. We have further noted that this court's writ opinion indicated that the generalized issue he raised went to the merits; however, when trial counsel tried to present a witness at trial on the issue of due diligence, the trial court would not allow the witness to be called because the issue was one of law and, thus, not proper for the jury's consideration. Thus, Defendant was unable to present an argument that potentially could have negated an element of the crime of illegal possession of a firearm by a convicted felon. It is our opinion that both the trial court's ruling and our ruling were correct. With that in mind, we must hold that Defendant's dilemma was caused by trial counsel's pre-trial inaction regarding the due diligence issue. Therefore, trial counsel's deficient performance prejudiced Defendant's case.

Since the issue of due diligence in execution of the warrant was not addressed below, the record does not contain sufficient information to assess the ultimate merit of the issue. However, as trial counsel's ineffectiveness prevented the issue from being addressed at all in the trial court, Defendant's conviction for illegal possession of a weapon by a convicted felon is reversed, and the case remanded for further proceedings in accordance with this opinion.

Defendant argues that trial counsel was ineffective for a number of reasons, but we do not address some of them because of our previous ruling. However, we must discuss two other claims of ineffectiveness of counsel made in Defendant in his pro se brief. First, he claims that trial counsel was ineffective by

failing to object to the State's use of a lay witness to identify Defendant's voice on recordings of his threatening telephone calls to the police department. Notwithstanding that Defendant admitted making the telephone calls in his statement to police, we pretermit discussion of this assignment of error because we have reversed that conviction.

Next, Defendant assigns as error that trial counsel was ineffective for filing a motion to sever the terrorizing charge, rather than the possession of a firearm by a convicted felon charge. He claims that the latter charge allowed the admission of "other crimes evidence" that may have adversely affected his case regarding the attempted first degree murder charge. In *State v. Roberts*, 06-765 (La.App. 3 Cir. 1/17/07), 947 So.2d 208, we recently held that the trial court did not err by refusing to sever a possession of a firearm by a convicted felon charge from a murder charge and an attempted murder charge where there was strong evidence regarding each individual charge. Thus, in the instant case, trial counsel's actions did not prejudice Defendant's case under the *Strickland* test, and this assignment of error is, therefore, meritless.

## CONCLUSION

Defendant's conviction and sentence for attempted first degree murder are affirmed. However, his conviction for terrorizing is reversed, and his sentence is vacated. Also, Defendant's conviction for possession of a firearm by a convicted felon is reversed, his sentence is vacated, and the matter is remanded for further proceedings consistent with this opinion.

35

**AFFIRMED IN PART, REVERSED IN PART AND RENDERED, AND REVERSED IN PART AND REMANDED.**