STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-1319

STATE OF LOUISIANA

VERSUS

MARCUS JAMES JASON

************

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 73686-FB
HONORABLE THOMAS F. FUSELIER, DISTRICT JUDGE

************

JAMES T. GENOVESE
JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy H. Ezell, and James
T. Genovese, Judges.

CONVICTION REVERSED; SENTENCE VACATED
AND SET ASIDE; ACQUITTAL ENTERED.

Marcus A. Allen
840 South Washington Street
Lafayette, Louisiana 70501
(337) 289-1762
COUNSEL FOR DEFENDANT/APPELLANT:
    Marcus James Jason

Trent Brignac
District Attorney - Thirteenth Judicial District
200 Court Street, Room 202
Ville Platte, Louisiana 70586
(337) 363-3438
COUNSEL FOR APPELLEE:
    State of Louisiana

**GENOVESE, Judge.**

In this criminal case, the Defendant appeals his conviction of terrorizing, alleging trial court error in allowing a mid-trial amendment to the bill of information and insufficient evidence. For the reasons that follow, we reverse the Defendant's conviction, vacate and set aside the sentence, and enter an acquittal.

## PROCEDURAL HISTORY

On May 17, 2007, the Defendant was charged by bill of information with inciting a felony, a violation of La.R.S. 14:28, second degree battery, a violation of La.R.S. 14:34.1, and terrorizing, a violation of La.R.S. 14:40.1. After closing arguments in his jury trial, the Defendant moved for a directed verdict on the charge of inciting a felony, and a verdict of acquittal was granted by the trial court. Prior to charging the jury, the Defendant objected to the State's motion to amend the bill of information, and his objection was overruled. At the conclusion of trial, the Defendant was found guilty of second degree battery and terrorizing.

The Defendant was sentenced to serve four years at hard labor for second degree battery with restricted diminution of sentence as required by La.R.S. 15:571.3. As a result of his terrorizing conviction, the Defendant was sentenced to ten years at hard labor, three years suspended, and five years of active supervised probation. The sentences were ordered to run consecutively. Special conditions of probation included restitution to the victims for out of pocket expenses by an amount to be determined by probation and parole and subject to hearing if necessary. The Defendant was also ordered to have no contact with the victims or their families and to pay a $50.00 per month probation supervision fee. The Defendant did not file a motion to reconsider sentence.

1

The Defendant is now before this court on appeal, seeking review of the trial court's failure to declare a mistrial when the State amended the original bill of information after the trial had begun. The Defendant also asserts that the evidence was insufficient to support his terrorizing conviction. The Defendant does not appeal his second degree battery conviction or sentence.

## FACTS

On March 12, 2007, a basketball tournament was being held at a school gymnasium in Mamou, Louisiana. The Defendant and his brother, Kevin Jason, were watching the Defendant's daughter play basketball when Michael Fontenot and Troy Doucet arrived at the tournament. Mr. Fontenot and Mr. Doucet were the coaches of the ten-year-old boys' basketball team from Sacred Heart Elementary School, a team also playing in the tournament. Shortly after they entered the gym, the Defendant approached Mr. Fontenot, and without any apparent provocation, brutally attacked him in front of everyone inside the gym. Mr. Doucet attempted to intervene and was attacked by the Defendant's brother.

The men eventually made their way outside the gym where the Defendant continued to verbally assault the coaches and their families. Meanwhile, in the chaos that ensued, some people in the crowd watched, some parents chose to leave with their children to get out of harm's way, and some sought refuge inside the gym. Eventually, the police arrived, and the Defendant and his brother were arrested. Mr. Fontenot and Mr. Doucet sustained significant injuries and were taken to the hospital by ambulance.

At trial, testimony revealed that the Defendant perhaps harbored a grudge against Mr. Fontenot. At some time prior to the tournament, the Defendant's son

claimed that Mr. Fontenot, the son's physical education teacher at the time, had punished him by throwing him across the classroom or against the wall in the classroom. An investigation followed, and Mr. Fontenot was cleared of the allegation.

**ASSIGNMENTS OF ERROR**

1.  The court erred in failing to declare a mistrial when the State [a]mended the original Bill of Information to make a change to the definition and element to the charge of "Terrorizing" <u>after</u> the trial had began. The changing of the definition and elements of the crime was a "substantive" change versus a "formal" change[,] and[,] as such, the trial should have been declared a mistrial.

2.  The court erred in finding the Defendant, **MARCUS JAMES JASON**[,] guilty of the crime of "Terrorizing" when the State failed to provide evidence to prove all of the necessary elements of the crime.

**ASSIGNMENT OF ERROR NO. 2:**

Basically, the Defendant claims insufficiency of the evidence. He contends that the State failed to provide evidence to prove all of the necessary elements to support a conviction of terrorizing under La.R.S. 14:40.1. This assignment of error will be considered first since a ruling in the Defendant's favor on this issue will result in his acquittal, and the remaining alleged trial error will be rendered moot. If the evidence is sufficient to support a conviction, the Defendant is not entitled to an acquittal, and the remaining assignment of error will be considered to determine whether he is entitled to the reversal of his conviction. *State v. Hearold*, 603 So.2d 731 (La.1992); *State v. Gaspard*, 99-481 (La.App. 3 Cir. 11/3/99), 746 So.2d 725, *writ denied*, 99-3401 (La. 4/20/01), 790 So.2d 12.

The analysis for a claim of insufficient evidence is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

3

of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Terrorizing is defined in La.R.S. 14:40.1(A) as:

the intentional communication of information that the commission of a crime of violence is imminent or in progress or that a circumstance dangerous to human life exists or is about to exist, with the intent of causing members of the general public to be in sustained fear for their safety; or causing evacuation of a building, a public structure, or a facility of transportation; or causing other serious disruption to the general public.

As such, the State first has the burden of proving the intentional communication of information that the commission of a crime of violence is imminent or in progress, or that a circumstance dangerous to human life exists or is about to exist. Second, the State has the burden of proving the intent to cause members of the general public to be in sustained fear for their safety, or to cause evacuation of a building, a public structure, or a facility of transportation, or to cause other serious disruption to the general public.

In the instant case, the Defendant maintains that the State did not prove that he made statements to anyone or that he made statements to the general public. In the alternative, the Defendant contends that the State failed to show that he made any statements loud enough or in a manner that would foreseeably alarm the general

4

public and/or cause them to be in sustained fear for their safety. The Defendant asserts that this incident was isolated and confined to a certain individual in a certain area of the gym and outside and that neither the building nor the gym was evacuated due to any communication made by the Defendant.

Several instances in the record reflect that, while in the gym, the Defendant made statements in a loud manner to several individuals which were audible to bystanders. Although some witnesses could not hear the actual words used by the Defendant, the Defendant communicated that he was violent and that he was capable of committing violence while inside or outside the gym.

Mr. Doucet and Mr. Fontenot testified that the Defendant was screaming at Mr. Fontenot while he was approaching Mr. Fontenot in the gym. Mr. Doucet, however, was unable to hear the words the Defendant was saying because of the noise in the gym, and Mr. Fontenot could not recall the specific words used by the Defendant. Terez Doucet, Mr. Doucet's wife, and Michael DeVille, the father of a basketball player, testified that they heard yelling and screaming inside the gym. They did not testify, however, as to the specifics of what they heard.

After the fracas moved outside, the record reflects that the Defendant continued to yell at the coaches and their wives, verbally threatening harm to them and the bystanders attempting to stop the Defendant and his brother. Crystal Johnson testified that she observed the Defendant and his brother arguing and hollering back and forth with the wives of the coaches. She recalled that one of the wives wanted to know why they were doing this, and, in response, the Defendant and his brother began hollering remarks back and forth. Ms. Johnson was not exactly certain, however, of what the Defendant and his brother were saying, but described the

5

exchange as "a lot of arguing going on."

Mrs. Doucet stated that the Defendant was walking back and forth in the parking lot and heard her inquire as to who hit her husband. The Defendant walked up to her, about an arm's length away, and responded, "I did and I'll knock the [f---] out of you too[,] and I don't care if you [sic] a woman." According to Mrs. Doucet, a man standing next to the Defendant started laughing and tapped the Defendant on the shoulder and told him to leave her alone.

Mr. Doucet stated that he was present when the Defendant threatened his wife. Mr. Doucet testified that when the Defendant noticed he and his wife walking out of the gym together, the Defendant admitted to his wife that he was the man that hit her husband, and that " he would knock her [f------ a--] out to [sic] if she didn't like it, if she didn't get out of his face."

Angela Soileau, a mother attending her son's basketball game, also testified that she witnessed the Defendant threaten Mrs. Doucet. According to Mrs. Soileau, she heard Mrs. Doucet saying that the Defendant hit her husband, and then the Defendant walked up to her, laughing, and said, "I'm gonna [f------] kill you, too." Mrs. Soileau also heard the Defendant tell Mr. Doucet's son that he "knows where they live."

According to Mrs. Fontenot, the Defendant also yelled at her. Mrs. Fontenot testified that, after she made her way outside, she yelled at her husband to get in the truck to get away from the Defendant. When the Defendant heard her, he ran up behind her. When she turned around and told him to leave them alone, the Defendant responded, "I don't give a [f---] about you or that baby you're holding." The Defendant then started back toward Mr. Fontenot's truck where Mr. Fontenot had

taken refuge.

Mr. DeVille followed the crowd from the gym into the parking lot and was subsequently threatened by the Defendant as well. Mr. DeVille testified that when he attempted to stop the Defendant from pursuing Mr. Doucet, Mr. Fontenot, and their families, the Defendant hollered at him, "I'm gonna 'beat your [a--].'"

The record also indicates that the Defendant continued to holler at Mr. Fontenot while he was in his truck. Nicole Lee testified that the "taller guy" was standing at the front of Mr. Fontenot's truck, screaming at him. Mrs. Lee, however, was not allowed to testify as to what she heard because she did not positively identify the Defendant as the "taller guy" during her testimony. The Defendant, however, was determined to be the "taller guy" by other witnesses at trial. Mr. Doucet observed the Defendant walking back to Mr. Fontenot's truck and stated that he was still using profanity.

Considering the testimony at trial, we find that the State presented sufficient evidence to show that the Defendant intentionally communicated information by making loud verbal threats and by screaming and hollering at several individuals, which were audible to the general public. Further, the Defendant's verbal threats warned the specific individuals of impending physical violence and that he posed a danger to human life, thus satisfying the second element of the offense.

Whether or not the State proved the final element of intent, however, is not as clear. The State had the burden of proving that with the above conduct, verbal threats and screaming at specific people audible to the general public, the Defendant intended to cause members of the general public, other than those persons to whom he made the threats, to be in sustained fear for their safety, or that he intended to

7

cause evacuation of a building, a public structure, or a facility of transportation. The State did not produce any evidence that the Defendant made threats specifically directed at the general public, nor did the evidence show that the gym was purposefully evacuated.

Though deplorable, we find that the Defendant's actions were directed to the specific individuals involved and not intended to place the general public in sustained fear, or to cause an evacuation of the gym, or to cause serious disruption to the general public. The Defendant's clear motive was to harm Mr. Fontenot and anyone else who attempted to thwart his objective. In *State v. Brown*, 07-388, p. 9 (La.App. 3 Cir. 10/3/07), 966 So.2d 1138, 1145, *writs denied*, 07-2159 (La. 3/28/08), 978 So.2d 304, 08-326 (La. 3/28/08), 978 So.2d 312, this court stated, "The language of the [terrorizing] statute contemplates criminal acts which place the entire general population in fear." The issue and facts in *Brown*, however, are significantly different from those in the instant case and involved the determination of whether police officers are members of the "general public."

In *Brown*, the defendant made several phone calls to the police department, threatening to shoot any officers who patrolled in his neighborhood, and he claimed to have explosives in his home. After an argument with a neighbor the following day, the defendant armed himself with a rifle, began firing at his neighbor's home, and caused their retreat inside their house. The police responded, surrounded the defendant's home, and after attempts to force him out of his home, the authorities cut off his utilities. Eventually, the defendant emerged from his home and was taken into custody.

The primary issue before the court was whether police officers were members

8

of the "general public." The court focused on the 2001 amendment of the statute, which replaced the term "any person" with the term "general public," and determined that the amendment appeared to represent the legislature's effort to make the statute's application more restrictive. Additionally, the court noted the ruling in *City of West Monroe v. Cox*, 511 So.2d 1200, 1203 (La.App. 2 Cir. 1987), wherein that court analyzed La.R.S. 14:103, the disturbing the peace statute, and found that "[a] trained police officer is held to a 'higher degree of restraint than the average citizen' to avoid physical retaliation even to words that might be categorized as 'fighting words.'" The *Brown* court applied this principal to its interpretation of La.R.S. 14:40.1 and found that police officers are set apart from the "general public." Accordingly, this court concluded:

> It is apparent that if the term "any person" had been left in the statute, then the statute would apply to the present case. However, it is our opinion that the legislature's decision to substitute the term "general public" represents an apparent attempt to limit the application of the statute. Thus, this statute does not apply to the current factual scenario. Hay testified that he had concerns regarding Defendant's neighbors, but the evidence does not demonstrate that Defendant's threats were intended to place his neighbors in sustained fear, or to cause an evacuation, or disruption, in his neighborhood. Although police did conduct an evacuation, it was not initiated until police learned of the Harrell shooting.

*Brown*, 966 So.2d at 1145. The defendant's conviction for terrorizing was, therefore, reversed.

Although the facts of *Brown* are not analogous to the instant case, the discussion in *Brown* is illustrative of this court's interpretation of the amendment of La.R.S. 14:40.1 and its intent to limit the statute's applicability. Likewise, we conclude that the Defendant did not intend to place the general public in sustained fear for its safety or to cause serious disruption to the general public. Though the

9

State proved the communication element of the crime, it failed to carry its burden of proving beyond a reasonable doubt any one of the following key elements of the crime of terrorizing: (1) that there was an evacuation of a public building (gymnasium); or (2) that there was an intent to place the general public in sustained fear for its safety; or (3) that there was a serious disruption to the general public. Consequently, we reverse the Defendant's conviction of terrorizing. As a result thereby, the Defendant's remaining assignment of error has been rendered moot. Not having appealed his conviction of second degree battery or concommitant sentence, that conviction and sentence are not before this court and remain intact.

## DISPOSITION

The Defendant's conviction of terrorizing is reversed, his sentence imposed on that conviction is vacated, and an order of acquittal is entered.

**CONVICTION REVERSED; SENTENCE VACATED AND SET ASIDE; ACQUITTAL ENTERED.**